# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-277 (CKK)** |
| **CHRISTOPHER BRIAN ROE,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Christopher Roe to 71 months' incarceration, which is the top end of the Guidelines range as calculated by the government, and 36 months' supervised release, and order a mandatory assessment of $300 and $2,000 of agreed-upon restitution.

## I.    INTRODUCTION

By assaulting three different police officers, defendant Christopher Roe vigorously participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Roe travelled to Washington, D.C. from Kansas armed with a pitchfork and a six-inch knife and equipped with duct tape and zip ties. After arriving on Capitol Grounds, Roe forcefully tried to remove a bicycle rack barricade, which protected outnumbered police officers from the violence of rioters. After failing to do so, Roe assaulted one of those police officers with one hand while brandishing the pitchfork in the other. When the police officers responded by spraying chemical irritant at Roe, he only briefly retreated into the crowd before returning back to the Capitol, breaching the building at approximately 2:38 p.m.

After nearly 20 minutes inside, Roe approached an exit with police officers closely behind him. When Roe stopped moving forward, one officer pushed him to continue, which Roe violently resisted. Moments later, Roe, with the help of other rioters, assaulted the officer by pushing the officer backwards and wrapping his arm around the officer's baton. After this assault, officers ejected Roe from the Capitol for the first time.

Undeterred by the officers' clear order to leave the Capitol, Roe breached the Capitol again at the Columbus Doors and into the Rotunda Lobby. While inside the Capitol this location, Roe continued to physically engage with and resist police officers, including by shoving his shoulder into one officer, before he was again forcefully ejected.

After this third assault of a police officer and a second removal from the Capitol, Roe moved to the North Door. Here, a small group of police officers attempted to prevent rioters from creating yet another breach of the Capitol by holding a small set of double doors closed. To thwart these efforts, Roe approached the double doors with a bicycle rack and proceeded to slam it against

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

the doors approximately ten times before officers deployed a fire extinguisher towards him. Roe and the other rioters caused nearly $1,000 in damage to those doors. Only after this third attempt to breach the Capitol did Roe leave the grounds.

The government recommends that the Court sentence Roe to 71 months of incarceration. which reflects the gravity of Roe's conduct, as well as the callous disrespect Roe demonstrated towards police and the Capitol.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 19, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Roe's Role in the January 6, 2021 Attack on the Capitol

#### *Approach to the Capitol*

Roe traveled to Washington, D.C. from his home in Kansas to attend the Stop the Steal rally near the White House. Roe brought with him several atypical items for a political protest, including a metal-tipped pitchfork, a large knife, zip ties, and duct tape. Figure 1. Indeed, Roe so prominently displayed the knife that one passerby, who described it as a "six-inch dagger," told Roe that it was against the law to carry it in the District and that Roe should put it away. Gov't Ex.

1 at 1:36-2:00. Roe, however, dismissively thanked the passerby for the suggestion.



*Figure 1: Roe standing in the crowd of the Stop the Steal rally with the pitchfork buried in the ground*

After the rally, Roe continued onto the Capitol, arriving at the West Plaza at approximately 1:25 p.m. Roe continued to openly carry the pitchfork. While in the crowd at the West Plaza, another rioter, apparently recognizing the danger posed by the pitchfork, seems to have grabbed it in an attempt to stop Roe from doing anything with it. Figure 2. Roe, however, kept possession of the pitchfork as he continued to move closer to the police officers situated behind a bicycle rack barricade. Gov't Ex. 2 at 0:08.



*Figure 2: Roe (left) holding the pitchfork while another rioter grabs it from the top*

### *Roe's Assault of Officer R.E.*

Once Roe arrived towards the front of the crowd at the West Plaza, other rioters in the area began to fight with the police in an attempt to breach their line. Roe joined the fray by attempting to pull a bicycle rack away from officers and into the crowd. Figure 4; Gov't Ex. 3 at 2:39. Nearby officers quickly responded and stopped Roe from pulling the rack backwards, causing Roe to fall and drop the pitchfork. Gov't Ex. 2 at 1:04.



*Figure 3: Roe (circled in red) with the pitchfork prongs above his head*



*Figure 4: Roe (circled in red) attempting to pull the bicycle rack into the crowd*

As soon as Roe retrieved the pitchfork from the ground, another rioter began assaulting United States Capitol Police Officer R.E. Gov't Ex. 2 at 1:06. With the pitchfork in his right hand, Roe lunged forward to aid the rioter and wrapped his left arm around Officer R.E.'s left arm. Gov't Ex. 3 at 2:47; Figure 5. Roe then shoved Officer R.E. with his left hand. Figure 6. Officers responded by spraying chemical irritant at Roe, causing him to again drop the pitchfork and retreat into the crowd. Figure 7; Gov't Ex 2 at 1:12.

6



*Figure 5: Roe (circled in red) assaulting Officer R.E. while brandishing the pitchfork in his right hand, out of frame*



*Figure 6: Roe (left) continuing to assault Officer R.E.*



*Figure 6: Roe (circled in red) still holding the pitchfork immediately after the assault*

### Roe's Breach of the Capitol

After spending some time in the crowd recovering from the chemical irritant and changing his clothes, Roe returned to the front of the line of rioters. By this point in the day, rioters had breached through multiple police lines and reached the Upper West Terrace where they broke into the Capitol Building. On the Upper West Terrace, Roe followed a group of rioters towards one of the breached entrances. Before entering the Capitol, however, Roe looked through a pile of scaffolding pieces and briefly picked up a large collapsed ladder. Figure 7. Given the loss of his pitchfork, the other rioters in the vicinity carrying large pieces of metal structure, and his actions later in the day, Roe may have picked up the ladder to use as a weapon. However, by the time he entered the Capitol, he was not holding the ladder.



*Figure 7: Roe (circled in red) now wearing a black shirt, holding a large metal ladder*

Roe entered the Capitol through the Upper West Terrace Door at 2:38 p.m. In addition to the backpack Roe was wearing earlier, he also had a metallic emergency blanket draped over his shoulders. Figure 8. Soon after entering the building, Roe entered the Rotunda where a large crowd of rioters gathered. While in the Rotunda, Roe paused to take a photograph with another rioter in front of the statue of President Thomas Jefferson. Figure 9.



*Figure 8: Roe (circled in red) with the emergency blanket wrapped around him*



*Figure 9: Roe (circled in red, left) posing for a photograph*

Roe then continued onto Statuary Hall and towards the Chamber of the House of Representatives. On his way, Roe discarded the emergency blanket on the ground. Figure 10. Once outside of the House Chamber, Roe approached a large crowd of rioters who were trying to get into the chamber. As the situation unfolded, Roe lit some kind of cigarette and smoked it. Figure 11. After a few minutes, Roe walked around the crowd and down the connecting hallway. While there, Roe posed for another photograph, triumphantly displaying his fist in the air. Figure 12.



*Figure 10: Roe (circled in red) throwing the blanket on the ground*



*Figure 11: Roe (circled in red) putting a lit cigarette to his mouth*



*Figure 12: Roe celebrating amongst rioters*

### **Assault of Officer R.D.**

A few minutes after the above photograph was taken, police officers shot a rioter while she climbed through a broken window in order to enter the House Chamber and thereby jeopardized the safety of congressional members evacuating from the chamber. Police officers then more aggressively removed the rioters from the lobby outside the House Chamber and towards the

Upper House Door exit to clear them from the area. As Roe moved towards the exit, however, he paused to the side of a magnetometer, rather than passing through it. Gov't Ex. 4 at 0:10; Gov't Ex. 5 at 0:18-0:24.

Officer R.D. then grabbed Roe and pushed him towards the exit. Gov't Ex. 4 at 0:10-0:12. Roe responded by grabbing the magnetometer in an attempt to stay inside the Capitol. Figure 13; Gov't Ex. 5 at 0:26. Roe then turned to Officer R.D. and said,

> Where? Where? Are you going to fucking shoot me too? You guys are fucking a disgrace. A fucking disgrace. You are protecting traitors and treasonists. They committed treason. And you shot one of us. That's bullshit. Put your baton down and fucking join us.

Gov't Ex. 4 at 0:15-0:37.



*Figure 13: Roe (circled in red) grabbing the magnetometer*

After this exchange, other rioters began to assault the other officers in the area. Gov't Ex. 5 at 0:50. In response, Office R.D. turned around to help those officers. Roe briefly watched the incident unfold before covering his face with his neck gaiter and charging forward to join rioters in assaulting Officer R.D. Gov't Ex. 5 at 0:54-0:59. During the assault, Roe wrapped his arm around Officer R.D.'s baton, preventing the officer from using it in self-defense. Figure 14; Gov't

Ex. 4 at 0:44-0:50. Roe and the rioters also pushed Officer R.D. backwards several feet. Gov't Ex. 6 at 1:16-1:20. Roe then put his arms up in the air as if he was doing nothing wrong. Gov't Ex. 6 at 1:20-1:30.



*Figure 14: Roe (circled in red) wrapping his arm around Officer R.D.'s baton*

After the assault, the officers moved in concert to push the remaining rioters out of this area of the Capitol. Roe, however, resisted their efforts to do so. First, Roe continued to hold his hands in the air as he and the rioters continued to jostle with the officers. Gov't Ex. 5 at 1:25-1:28. Then, once outside the Capitol, Roe kicked one of the doors shut. Figure 15; Gov't Ex. 7 at 0:15. Afterwards, he stood between the door and the doorframe, refusing to leave the area. Figure 16; Gov't Ex. 4 at 1:52. Roe only left this position when the officers sprayed a chemical irritant at him. Figure 17; Gov't Ex. 7 at 0:40.



*Figure 15: Roe (circled in red) kicking a door shut after officers ejected him from the Capitol*



*Figure 16: Roe (circled in red) refusing to leave this entrance to the Capitol*



*Figure 17: Roe (circled in red) fleeing the area after officers appeared to spray him with a chemical irritant, while the zip ties are still visibly located inside his backpack*

### Second Breach of the Capitol

After this ejection, Roe joined a crowd of rioters gathered outside of the Columbus Doors, which lead to the Capitol Rotunda. At this location, rioters violently attempted to overwhelm outnumbered police officers to breach into the Capitol. By 3:21 p.m., the rioters succeeded and poured into the Capitol with Roe following just ten seconds behind the breach. Figure 18. As the rioters continued into this area, known as the Rotunda Lobby, Roe turned back towards the doorway and waved more of them forward. Gov't Ex. 8 at 0:36; Figure 19.



*Figure 18: Roe (circled in red) moments after his second breach of the Capitol*



*Figure 19: Roe (circled in red) waving rioters forward*

Eventually, Roe made it through the crowd and back into the Capitol Rotunda for a second time. The officers inside the Rotunda, however, quickly ejected Roe back into the Rotunda Lobby. As before, Roe resisted police efforts, holding his arms open wide and grabbing onto a set of double doors. Figure 20; Gov't Ex. 8 at 3:58. Roe's attempt to remain in the Rotunda failed and he rejoined the crowd of rioters who officers were removing from the Capitol.



*Figure 20: Roe (circled in red) grabbing at doors as police push him into the Rotunda Lobby*

### *Roe's Assault in the Rotunda Lobby*

Once in the crowd, Roe continued to actively resist the efforts of officers. At 3:25 p.m., one officer tried to push Roe forward. Roe responded by pushing his shoulder into the officer. Figure 21; Gov't Ex. 9 at 5:13. Then, as the officers moved Roe towards the exit, Roe consistently either refused to move from where he was standing, or actively impeded officers' attempts to control him. Gov't Ex. 9 at 5:10-10:28. In the midst of this struggle, Roe again raised his hand in the air in triumph and defiance of the officers. Figure 22.



*Figure 21: Roe (circled in red) pushing his shoulder into an unidentified police officer*



*Figure 22: Roe (circled in red) pumping his fist in the air*

Eventually, the officers successfully pushed Roe back to the doors leading out of the Capitol. Roe again resisted their efforts by grabbing the double doors with both arms. Figures 23-24. Due to Roe's resistance, the officers had to use significant force to oust him from the Capitol a second time. Gov't Ex. 10 at 0:29-0:37.

 

*Figure 23*                    *Figure 24*

### *Roe's Attempted Third Breach of the Capitol*

Once outside of the Capitol, Roe moved to the north side of the Capitol where another large group of rioters were attempting to breach the North Door entrance. That entrance consists of two sets of double doors. By the time Roe arrived at approximately 4:16 p.m., the outer doors were already heavily damaged and held open by rioters. The inner doors, however, remained shut as a small group of police officers guarded the entrance. In an attempt to breach these doors, Roe grabbed a bicycle rack and used it as a battering ram against the doors approximately ten times. Figures 25-26; Gov't Ex. 11 at 26:54-27:19; Gov't Ex. 12 at 16:46-16:54. Roe only stopped when the officers inside the Capitol deployed a fire extinguisher into the vestibule between the two sets of doors. Gov't Ex. 11 at 27:19. Shortly after this attempted breach, a large group of police officers cleared the rioters out of this area.

After the riot, the Architect of the Capitol determined that the rioters caused approximately

19

$980 in damage to the inner doors.



*Figure 25: Roe (circled in red) bringing the bicycle rack from the crowd to the doors*



*Figure 26: Roe slamming the inner doors with the bicycle rack*

***Search of Roe's Home***

During Roe's arrest on the present charges, the FBI executed a search warrant of his home in Raytown, Missouri for evidence related to January 6. During the search, the FBI located one of the American flag neck gaiters that Roe wore during the riot, displayed on a metal rooster. Figure 27. The agents also located a fully constructed LEGO model of the United States Capitol in one

of his closets. Figure 28. Lastly, the FBI located numerous unsecured firearms, loaded clips and magazines, and boxes of ammunition throughout Roe's home, despite federal law prohibiting him from possessing firearms due to his prior felony conviction. *See, e.g.*, Figures 29-30.[2]



*Figure 27: One of Roe's American flag neck gaiters, circled in red*



*Figure 28: LEGO model of the U.S. Capitol located in Roe's home*

---

[2] The government is unaware of any pending charges in the Western District of Missouri for offenses under 18 U.S.C. § 922(g).



*Figure 29: Unsecured AR-15-style rifle located in Roe's home*



*Figure 30: Two loaded magazines and several boxes of ammunition located in Roe's home*

## III.  THE CHARGES AND PLEA AGREEMENT

On August 16, 2023, a federal grand jury returned an indictment charging Roe with fourteen counts, including three counts of assaulting a federal officer, in violation of 18 U.S.C. § 111(a)(1). ECF No. 9. On November 2, 2023, Roe was convicted of those assault offenses based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Roe now faces sentencing on three counts of assaulting a federal officer.

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, for each count, Roe faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with the Guidelines calculation as stated in the Presentence Report, which is as follows:

Count One: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. §2A2.2 | Base Offense Level | 14 |
| U.S.S.G. §2A2.2(b)(2)(C) | Brandishing a Dangerous Weapon | +3 |
| U.S.S.G. §3A1.2(a)-(c) | Official Victim | +6 |
| | **Total** | **23** |

Count Three: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| `    U.S.S.G. §2A2.2 | Base Offense Level | 14 |
| U.S.S.G. §3A1.2(a)-(c) | Official Victim | +6 |
| | **Total** | **20** |

Count Five: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. §2A2.2 | Base Offense Level | 14 |
| U.S.S.G. §3A1.2(a)-(b) | Official Victim | +6 |
| | **Total** | **20** |

This calculation is consistent with the stipulated Guidelines calculations in the plea agreement. ECF 21 at 3-4.

As permitted by the plea agreement, Roe now challenges the applicability of the brandishing enhancement under U.S.S.G. §2A2.2(b)(2)(C). ECF No. 21 at 3 n.1; PSR ¶ 34. Roe first argues that the pitchfork was not a dangerous weapon because he did not use it "with the intent to commit bodily injury." *Id.*; U.S.S.G. §2A2.2, cmt. n.1. Roe, however, fails to grapple with the complete definition of a dangerous weapon. Under Section 2A2.2, a dangerous weapon is defined either as "any instrument that is not ordinarily used as a weapon . . . if such an instrument is involved in the offense with the intent to commit bodily injury" *or* as the term is defined in Section 1B1.1. U.S.S.G. §2A2.2, cmt. n1. Under that section, a dangerous weapon includes "an instrument capable of inflicting death or serious bodily injury." U.S.S.G. §1B1.1, cmt. n.1(E). Thus, the Court need only determine whether the pitchfork was capable of causing death or serious bodily injury.

This conclusion is clear on the facts before the Court. As described above and admitted by the defendant in the statement of offense, ECF No. 19 at 3, the top of the pitchfork was metal and had pointed tips. Those tips functionally made the pitchfork a weapon capable of causing four separate stab wounds at the same time. Even other rioters in the crowd appeared to recognize the danger posed by the pitchfork as one rioter grabbed onto its top while Roe was holding it near the police line. Thus, based on the physical characteristics of the instrument and its apparent danger to those around Roe, the pitchfork was capable of causing serious bodily injury.

Roe next argues that even if the pitchfork was a dangerous weapon, he did not brandish it by holding it during the assault. PSR ¶ 34. Under the Guidelines, "'[b]randished' with reference to a dangerous weapon . . . means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person,

regardless of whether the weapon was directly visible to that person." U.S.S.G. §1B1.1, cmt. n.1(C). The sequence of actions comprising the assault shows that Roe held onto the pitchfork in order to intimidate the officers behind the barricade. When Roe approached the barricade, he held it high in air with the tips pointed upwards. This constituted a threat of force by showing the police officers that he had a dangerous weapon in his possession.

Shortly after this initial display, Roe, while still carrying the pitchfork, tried to forcefully remove one of the barricades protecting the officers. The officers' response then caused Roe to fall backwards and drop the pitchfork on the ground. As Roe recovered from the fall, another rioter instigated violence with the police. Roe quickly intervened to assault Officer R.E., but not before picking the pitchfork up off the ground and holding it in a ready position. That Roe failed to actually use the pitchfork to injure Officer R.E. does not negate the application of this enhancement. Rather, if he had used the pitchfork, Roe would receive the heightened enhancement under U.S.S.G. §2A2.2(b)(2)(B). This enhancement only requires the display of a dangerous weapon for the purposes of intimidating the viewer, which Roe certainly did in this case. Thus, the Court should apply the three-level enhancement under U.S.S.G. §2A2.2(b)(2)(C) because Roe brandished a dangerous weapon during the offense.

In response to this argument, Roe asserts that he merely "possessed the pitchfork as a symbolic gesture." PSR ¶ 34. Yet, pitchforks are paradigmatically symbolic of popular revolts against authority.[3] The clichéd image of a violent mob depicts a group of disgruntled persons

---

[3]   *See e.g.*, "Uprisings of the Common Man: 4 Bloody Peasant Revolts, https://historycollection.com/peasant-revolts/ ("During the Pitchfork Uprising in 1920 in the village of Yanga Yelan, peasants organized a rebellion in reaction to the confiscation of their food by the Red Army[.] . . . Because they had no access to artillery, the peasants used tools of their trade as weapons: pitchforks, spades, and axes.") (last accessed Jan. 30, 2024).

carrying pitchforks, bludgeons, and torches chasing Frankenstein's monster into the night for violent ends. The symbolism implicated by Roe is thus one of violence. By displaying his pitchfork to the officers in a similar manner, Roe wanted the police officers to know that he and the other rioters were such persons prepared for violence.

*Grouping*. Under U.S.S.G. §3D1.2(a), counts that "involve the same victim" group. For the three counts of conviction, each count involves a different victim. Thus, none of the counts group. The lead offense is Count One, which has an offense level of 23. The other two counts each have an offense level of 20. Under U.S.S.G. §3D1.4(a), Count One receives one unit and the other two counts receive one unit each for a total of three units. Three units increases the offense level by 3 levels for an offense level of 26. *Id.*

*Acceptance of Responsibility (U.S.S.G. §3E1.1)*. Section 3E1.1(a) provides a two-level decrease in offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." Similarly, Section 3E1.1(b) provides for an additional one-level reduction in offense level in certain circumstances applicable here. In determining whether to apply the adjustment, a court should consider, among other things, whether the defendant "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admit[ed] or [did] not falsely deny[] any additional relevant conduct for which the defendant is accountable under § 1B1.3"— which includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and all harm caused by those acts or omissions or was the object of those acts or omissions. U.S.S.G. §§1B1.3(a)(1)(A), 3E1.1 cmt. n.1(A). The government agrees that Roe is entitled to a three-level downward adjustment under

U.S.S.G. §3E1.1(a) and (b) because he pleaded guilty pursuant to a plea agreement and did not contest the factual bases for his guilt for the three counts of conviction.

*Criminal History Category*. The U.S. Probation Office calculated Roe's criminal history as category III, which is not disputed. PSR ¶ 56.

*Advisory Sentencing Guidelines*. Based on the government's calculation of Roe's total adjusted offense level, after acceptance of responsibility, at 23, Roe's Guidelines imprisonment range is 57 to 71 months' imprisonment.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Roe's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Roe came to Washington, D.C. equipped with weapons and the means to restrain detained persons. Once he arrived at the Capitol, he violently assaulted multiple police officers and resisted all attempts to remove him from the building. Then, after his second ejection from the Capitol, he used a bicycle rack as a battering ram in an effort to reenter the building yet again. The nature and circumstances of Roe's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 71 months' incarceration.

### B.  Roe's History and Characteristics

According to the PSR, Roe has a lengthy history in the criminal justice system. PSR ¶¶ 60-

27

69. In 2003, Roe was sentenced to 6 months in jail for destruction of property. PSR ¶ 60. Two years later, he was arrested for driving under the influence of alcohol, but he received diversion. PSR ¶ 67. In 2006, he was sentenced to 15 months' incarceration for setting his mother's car on fire in an attempt to defraud an insurance company. PSR ¶ 61. While serving the sentence for this offense, Roe escaped from the detention center, which resulted in an additional sentence of 5 months' incarceration. PSR ¶ 62. In 2012, he was ordered to pay a fine following a conviction of stealing. PSR ¶ 63. In 2014, he was sentenced to one year incarceration for a conviction of driving under the influence of alcohol, second offense. PSR ¶ 64. Lastly, in 2021, he was arrested for trespassing at a Post Office after refusing to comply with a mask mandate. PSR ¶ 69. Put simply, Roe is a repeat offender who has ignored attempts by the judicial system to change his behavior. Yet Roe appears to have benefited from a relatively stable upbringing and adult life. PSR ¶ 70-82. Indeed, he has been gainfully employed with the same employer since 2012, PSR ¶ 82, and he reported growing up in a seemingly positive home, PSR ¶ 73.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Roe's criminal conduct on January 6 was the epitome of disrespect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, with a criminal history category of III, Roe has demonstrated a clear pattern of recidivism, including violent and destructive behavior. *See supra* Section VI(B). Second, although Roe pleaded guilty early in this case, he has not made any statement of remorse regarding his actions. Indeed, during the riot itself, Roe had several opportunities to disengage and retreat from the Capitol following multiple distinct violent confrontations with police officers. Roe, however, continued to commit harmful acts up and until police officers were able to regain control of the Capitol. This failure to have remorse for and readjust his conduct presents a strong need to specifically deter Roe from future criminal acts.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007)

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

(quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Mark Ponder*, 21-cr-259 (TSC), the defendant assaulted multiple police officers with a variety of poles. When Ponder's first pole broke against a police officer's riot shield, Ponder picked up another pole and assaulted a different officer with it. Fifteen minutes later, Ponder used the same pole to assault yet another officer. After Ponder was released by police following a brief period of detention, he then joined the group of rioters assaulting police officers at the mouth of the Tunnel. Ponder, like Roe, had a criminal history category of III. Judge Chutkan sentenced Ponder to 63 months' incarceration.

Unlike Ponder, Roe came to Washington, D.C. prepared for violence. In addition to the pitchfork, one of the attendees of the Stop the Steal rally observed a "six-inch dagger" in Roe's possession. Roe also carried zip ties and duct tape with him, which could be used to restrain people. Given his comments describing congressional members as "traitors and treasonists," these were the people he likely wanted to detain. Roe also spent approximately half-an-hour inside the

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Capitol, resisting all efforts by police efforts to clear the building and restart the congressional proceedings. Once ejected from the Capitol for the final time, Roe used a bicycle rack as a battering ram, helping to cause nearly $1,000 in property damage. Thus, these acts warrant a somewhat higher sentence than the one imposed in *Ponder*.

In *United States v. James McGrew*, 21-cr-398 (BAH), the defendant traveled to Washington, D.C. with a cannister of bear mace to "peacefully" attend the Stop the Steal rally. After the rally, he marched with other attendees to the West Plaza of the Capitol. Once the rioters breached the police line and McGrew entered the Capitol, he struck a police officer and demanded that the officer leave the building. While in the Capitol, McGrew encouraged numerous groups of police officers and refused their orders to leave the building. At times, McGrew struck additional officers and grabbed onto their batons. After officers ejected him from the Capitol, McGrew traveled around to the Tunnel where he threw a wooden handrail towards police officers. After January 6, participated in interviews during which he minimized or denied his actions. Judge Howell sentenced McGrew to 78 months' incarceration.

McGrew, like Roe, had a significant criminal history. McGrew's category, however, was V. McGrew also threw a large wooden handrail at police officers, after having been ejected from the Capitol. Taking into these facts into consideration against Roe's preparations regarding weapons and detention materials, as well as his targeting of congressional members, indicates that an appropriate sentence for Roe is one slightly lower than the one imposed in *McGrew*.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The identified victims in this case, Officers R.E and R.D., did not suffer bodily injury as a result of Roe's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Roe must pay $2,000 in restitution, which reflects in part the role Roe played in the riot on January 6.[8] Plea Agreement at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Roe's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

*See* PSR ¶ 110.

**VIII.   CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 71 months' incarceration, 36 months' supervised release, $100 mandatory assessment for each felony offense, and $2,000 restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:     */s/ Andrew S. Haag*
        Andrew S. Haag
        Assistant United States Attorney
        MA Bar Number 705425
        601 D Street NW
        Washington, D.C. 20530
        (202) 252-7755
        andrew.haag@usdoj.gov