IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 23-CR-277-CKK |
| | ) | |
| CHRISTOPHER BRIAN ROE, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Mr. Roe is a thirty-nine year old husband, a father to a special-needs toddler, and gainfully employed as a meat cutter in a grocery store. Like millions of other Americans, Mr. Roe believes the 2020 election was wrongfully stolen from former President Trump. Based on the parsimony principle, the criteria of 18 U.S.C. § 3553(a), and the unique circumstances of this offense, a term of twelve months and a day is "sufficient, but not greater than necessary" to satisfy the statutory objectives of sentencing.

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every

1

case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487-488 (2011). 18 U.S.C. § 3553(a) directs a court to impose a sentence that is "sufficient, but not greater than necessary" to satisfy the statutory goals of sentencing enumerated at § 3553(a)(2). This mandate, the parsimony principle, operates to set an "independent limit on the sentence a court may impose." *United States v. Jimenez-Beltre*, 440 F.3d 514, 525-26 n.8 (1st Cir. 2006) (Howard, J., concurring).

Against this backdrop, the court shall consider the 1) "nature and circumstances of the offense, and the history and characteristics" of Mr. Roe; 2) the need for the sentence to reflect the severity of the offense, to provide deterrence, to protect the public, and to provide Mr. Roe with educational, vocational, and correctional treatment in the most effective manner; 3) the kinds of sentences available; 4) the sentencing guideline range; 5) the sentencing policy statements; 6) the need to avoid unwarranted sentence disparity; and 7) the need to provide restitution.

**A. Former President Trump has convinced millions of Americans that the 2020 election was stolen from him through massive electoral fraud.**

Millions of Americans believe the 2020 presidential election was stolen by Joe Biden and Democrat operatives. Then President Trump trumpeted this claim to the nation repeatedly and loudly from the time of the 2020 election to January 6, 2021, and continues to press that claim today. Even before the election, Trump "repeatedly used social media, including Twitter and Facebook, to spread false claims of fraud, going so far as to claim that the only way he could lose the election was if it was 'rigged.'" Richard L. Hasen, *Identifying and Minimizing the Risk of Election Subversion and Stolen Elections in the Contemporary United States*, 135 Harv. L. Rev. 265, 269 (April 20, 2022). Trump disseminated over four hundred false claims of rigged or stolen elections to his supporters via Twitter after the 2020 election. *Id*. at 269-70.

In the months leading to January 6, the Big Lie was amplified by various right-wing news outlets, such as One America News Network (OAN), Newsmax, and Right Side Broadcasting (RBN). *Id*. at 270. Between November 3 and December 23, Sydney Powell and Rudolph Giuliani appeared on various television shows, such an OAN, Newsmax's *Greg Kelly Reports*, and Fox's *Lou*

*Dobbs Tonight*, claiming Dominion voting machines were designed by three Venezuelans "in order to fix elections" for Hugo Chavez. *US Dominion, Inc. v. Powell*, 554 F.Supp.3d 42, 51-52 (D.D.C. Aug. 11, 2021). Michael Lindell, the founder of MyPillow, appeared on Newsmax and declared "the biggest fraud is the Dominion machines," claiming Dominion machines "were built to cheat" and "steal elections." *US Dominion, Inc. v. MyPillow, Inc.*, 2022 WL 1597420, at *1 (D.D.C. May 19, 2022); *see also Freeman v. Giuliani*, 2022 WL 1655132, at 2-3 (D.D.C. 2022) (addressing Giuliani's false narrative circulated on social media, podcasts, websites, and OAN that Georgia election workers had committed election fraud).

At the January 6 "Stop the Steal" rally, Trump "directed his supporters to the Capitol after he and other speakers once again claimed a rigged and stolen election and demanded that Vice President Pence and others do something about it." Hasen, Harv. L. Rev. at 275. Trump warned his supporters, "if you don't fight like hell, you're not going to have a country anymore."[1] Trump told the crowd

---

[1] Available at https://apnews.com/article/election-2020-joe-biden-donald-trump-capitol-siege-media-e79eb5164613d6718e9f4502eb471f27 (last accessed Feb. 5, 2024).

"this year they rigged an election . . . like they're never rigged an election before" and "you don't concede when there's theft involved." *Id*. Trump described the electoral theft as a "disgrace" that occurred due to "a criminal enterprise" involving radical leftist Democrats. *Id*. Trump asserted "When you catch somebody in fraud, you're allowed to go by very different rules," claimed this was "the most corrupt election in the history, maybe of the world," and exhorted the crowd "[w]e must stop the steal and then we must ensure that such outrageous election fraud never happens again." *Id*.

Trump's false claims were bolstered by elected officials - local, state, and national - including Senator Josh Hawley from Missouri, who infamously raised a clinched fist in faux solidarity with persons gathered outside the Capitol before its breach. Even after the breach of the Capitol, "138 Republican members of the House and seven Republican Senators voted to object to the counting of Pennsylvania's Electoral College votes based on spurious grounds." Hasen, 135 Harv. L. Rev. at 274-75.

The lack of evidence of voter fraud has not quelled the beliefs of many Americans that the election was stolen. Over 40% of white persons believe there

was some fraud in the election results. 2021 Collaborative Multiracial Post-Election Survey, CMPSurvey (Oct. 5, 2021).[2] For the November 8, 2022 election, 345 candidates on the ballot had expressed election denial beliefs – false claims that the presidential election in 2020 was flawed. The Brookings Institution, E. Kamarck and N. Elsen, *Democracy on the ballot – how many election deniers are on the ballot in November and what is their likelihood of success?* (Oct. 7, 2022).[3] Trump's stolen election claim has become a core article of faith, part of what it means in the contemporary United States to be a Republican with 59% of Republicans and Republican-leaning independents "believing Donald Trump won the 2020 election." Hasen, 135 Harv. L. Rev. F. at 280-81. Among Republicans, 78% say Biden did not win, and 54% believe there is solid evidence of that although no such evidence exists. *Id*. at 281.

The United States is experiencing an era of "extreme political

---

[2] Available at https://cmpsurvey.org/2021/09/23/ucla-led-national-survey-shows-attitudes-about-politics-and-policy-vary-among-racial-groups/ (last accessed Nov. 8, 2022).
[3] Available at https://www.brookings.edu/blog/fixgov/2022/10/07/democracy-on-the-ballot-how-many-election-deniers-are-on-the-ballot-in-november-and-what-is-their-likelihood-of-success/ (last accessed Nov. 8, 2022).

polarization," and there may be no single individual more responsible for that polarization than Trump. Franks, AS; Hesami, F, *Seeking Evidence of The MAGA Cult and Trump Derangement Syndrome: An Examination of (A)symmetric Political Bias*, Societies 2021, 11, 113 at p.1.[4] Research demonstrates his supporters "experience motivated social cognition to adopt his position on issues," and "the higher level of Trump support, the higher the level of bias." *Id*. at 6. Across three studies, research demonstrates Trump's supporters "consistently shifted their attitudes to more closely match ostensible opinions and the real-life interests of Trump." *Id*. at 12. In one study, researchers found "nearly half of Trump voters were willing to subvert democracy to some degree in order to benefit Trump." *Id*.

These results lend credence to "accusations that some Trump supporters have a cult-like loyalty" to him. *Id*. A cult can "catalyze the formation of "shared psychotic disorder" because it involves a dominant, charismatic leader who dictates the beliefs, actions, and behaviors of followers. Brian Holoyda, MD, MPD, and William Newman MD, *Between Belief and Delusion: Cult Members and the Insanity Plea*, 44 Journal of the American Academy of Psychiatry and the Law,

---

[4] Available at https://doi.org/10.3390/soc11030113

p. 53 (2016); *see also* Joshi, KG, Frierson RL, Gunter TD, *Shared psychotic disorder and criminal responsibility: a review and case report of folie a trois*, Journal of American Academy of Psychiatry and the Law, 34: 511-517 (2006).

### B. Mr. Roe's good faith belief that the 2020 election was fraudulently stolen mitigates his culpability and the severity of his offense conduct.

Like millions of other Americans, Mr. Roe believes the 2020 Presidential election was stolen, and those beliefs motivated his offense conduct on January 6, 2021. Those beliefs were based on the statements of Trump himself, various television news outlets, internet sources, social media, and elected government officials. The court has not only the authority, but the duty to consider the mitigating nature of these beliefs when sentencing Mr. Roe.

Society has long recognized a defendant that commits an offense attributable to cognitive deficits may be less culpable than other defendants. *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). A defendant's cognitive deficits may mitigate the severity of an offense and justify leniency. *Cf. Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986) (execution of mentally ill frustrates retributive goal of sentencing and promotes disrespect for the law). The Sentencing Guidelines authorize a district court to depart downward if a

8

defendant's diminished capacity contributed to the commission of the offense. U.S.S.C. § 5K2.13. Likewise, the sentencing criteria at 18 U.S.C. § 3553(a) directs a court to consider the nature and circumstances of the offense and the defendant's history and characteristics.

Consistent with these authorities, Mr. Roe's good faith belief the 2020 presidential election was fraudulent mitigates his culpability and the severity of his offense conduct. Mr. Roe traveled to Washington, D. C., to attend the Stop the Steal rally where Trump implored its attendees to march on the Capitol and "fight like hell" to save their country. Like many others, Mr. Roe marched to the Capitol to reverse what he genuinely believed was a stolen election. The authenticity of this belief is evident by Mr. Roe's telling officers they were "protecting traitors and treasonists" (PSR at ¶ 23). That belief is central to an appreciation of the nature and circumstances of the offense.

Against the backdrop of this belief, Mr. Roe's conduct is not as severe as depicted by the government. Mr. Roe's first offense involved him pushing against an officer with his left hand while holding a pitchfork with his right (PSR at ¶ 21). Mr. Roe never used or threatened the use of the pitchfork during this

offense. Mr. Roe's second offense involved wrapping his arm around an officer's baton and pushing him backward (PSR at ¶ 24). Mr. Roe's third offense also involved his pushing against an officer (PSR at ¶ 25).

Mr. Roe's violations under 18 U.S.C. § 111(a) were less serious than assaults. That section prohibits forcibly "assaulting, resisting, opposing, impeding, intimidating, and interfering" an officer. An assault is "an intentional attempt or threat to inflict injury upon someone else, when couple with an apparent present ability to do so, that places another in reasonable apprehension of immediate bodily harm." *United States v. Cua*, 657 F. Supp. 3d 106, 113 (D.D.C. Feb. 22, 2023).

Because Mr. Roe never injured an officer nor did he intend to do so, this conduct does not satisfy the definition of assault. Instead, Mr. Roe's conduct is more akin forcibly resisting, opposing, impeding, and interfering with an officer. The court should consider the relatively mild nature of Mr. Roe's underlying conduct in determining the sentence.

Mr. Roe's underlying motivation was to preserve the integrity of the 2020 presidential election and to protect the Constitution. Mr. Roe's willingness to

follow Trump's explicit directive on January 6 to march on the Capitol is comparable to a misguided act of civil disobedience. Historically, civil disobedience "has been important to this country's political development, alerting the majority to injustices and unwise policies." *See* Note, *The State Made Me Do It: The Applicability of the Necessity Defense to Civil Disobedience*, 39 Stan. L. Rev. 1173, 1175 (1987). Beginning with the Boston Tea Party and continuing through the antislavery, labor, women's rights, civil rights, antiwar, and antinuclear movements, civil disobedience has been a familiar sight on the American political landscape. *Id*. at 1175-76.

    Here Mr. Roe's offense conduct was motivated entirely by his belief in the repeated assertions of the sitting President – the chief of the Executive Branch imbued with a constitutionally mandated duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. Despite their illegality, Mr. Roe's conduct was aimed at preventing a greater harm to our democracy – a stolen election in defiance of the will of the electorate expressed in the 2020 presidential election. *See United States v. Schoon*, 971 F.2d 193, 196 (9th Cir. 1991) (describing necessity as a utilitarian defense that justifies "criminal acts taken to avert a

greater harm, maximizing social welfare by allowing a crime to be committed where the social benefits of the crime outweigh the social costs of failing to commit the crime"). Given this unique and paramount circumstance, a guideline sentence is unwarranted and unjust. A sentence of twelve months and a day is sufficient to satisfy the statutory objectives of sentencing.

> **C. An application of the criteria of 18 U.S.C. § 3553 to Mr. Roe's case demonstrates a sentence of twelve months and a day is "sufficient, but not greater than necessary" to satisfy the statutory objectives of sentencing.**[5]

Mr. Roe has taken full responsibility for his actions and is not a risk to reoffend. Although it has yet to promulgate any standards or recommendations, the Sentencing Commission has identified several individual characteristics directly linked to recidivism. *See Rita v. United States*, 127 S. Ct. 2456, 2473 (2008) (Stevens, J., concurring). According to these findings, the best candidates to not recidivate are those with a good history of employment, employment at the time of sentencing, and a stable living situation. U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, 12-14 (May 2004);

---

5 This section includes information from support letters that will be emailed to the court and the government before sentencing.

12

*see United States v. Ruff*, 535 F.3d 999, 1001-02 (9th Cir. 2008) (variance from 30-37 guideline range to one day confinement and twelve months of community confinement was reasonable based on defendant's strong employment record, low risk of recidivism, and need for restitution). Each factor is present in Mr. Roe's case.

Mr. Roe has worked full-time as a meat cutter since 2012 when he began working at Hyvee, a grocery store in Raymore, Missouri (PSR at ¶ 82). Mr. Roe works in the same capacity at McKeever's Price Chopper in Leawood, Kansas (PSR at ¶ 82). Mr. Roe's supervisor, Ryan Hinson, describes him as "a hard worker" who is "great with customers." Based on his work habits and character, Hinson states Mr. Roe "will be welcome to work at whatever store [he] is running" after completing his sentence.

The government suggests Mr. Roe illegally possessed a firearm and ammunition when FBI agents executed a search warrant of his home in Raytown, Missouri, for evidence related to this case. That suggestion is inaccurate, however, as Kansas automatically restores a felon's right to possess a firearm five years after conviction or release from imprisonment for that offense. *See United*

13

*States v. Baker*, 508 F.3d 1321, 1328 (10th Cir. 2007) (construing Kan. Stat. Ann. § 21-4204(a)(3)); *see also* Kan. Stat. Ann. § 21-6304; *United States v. Hoyle*, 697 F.3d 1158, 1167-70 (10th Cir. 2012). That automatic restoration applies here since Mr. Roe was released from prison in 2007 (PSR at ¶ 61).

Mr. Roe enjoys a stable living condition with his wife, Leah, and their two-year-old child (PSR at ¶ 75). Mr. Roe and Leah will have been together twelve years in March, and have been married since June 2017. Leah describes Mr. Roe as "a loving father, a supportive spouse, and a hardworking, loyal individual who tries to do the right thing."

Mr. Roe's son, Eli, struggles with developmental delays in his speech and suffers from Hypotonia, which causes low muscle tone and difficulty walking (PSR at ¶ 74). Eli participates in speech and physical therapy for these conditions through Missouri First Steps, an early intervention program for infants and toddlers that suffer from developmental disabilities(PSR at ¶ 74). Mr. Roe is learning sign language to assist in communicating with his son (PSR at ¶ 74).

Theodore Haggerman lives in the other half of the duplex in which Mr. Roe and his family reside, and has known Mr. Roe for ten years. Haggerman

describes Mr. Roe as an "honest, helpful hard-working individual" who is "friendly, kind and considerate" to all the neighbors in their duplex complex. According to Haggerman, Mr. Roe is "always ready to step up and help any of his neighbors in need."

## CONCLUSION

The January 6 cases are unique and unparalleled in American history. Never has a President attempted to remain in power despite having lost an election. Never has a President obstructed the peaceful transition of power. Never has a President spread "pervasive and destabilizing lies about election fraud" to "create an intense national atmosphere of mistrust and anger" and "erode public faith in the administration of the election." *United States v. Trump*, 23-CR-257-TSC, Indictment, ECF# 1 at 1-2 (filed Aug. 1, 2023).

Mr. Roe believed former President Trump's assertion that the 2020 presidential election was stolen from him by fraudulent means, and that "you're allowed to go by very different rules" when there is fraud in an election. Mr. Roe's offense conduct is directly attributable to that belief. Under these circumstances, a lengthy sentence of imprisonment is unnecessary to satisfy the

statutory objectives of sentencing.

WHEREFORE, Mr. Roe requests the court to impose a sentence of twelve months and a day.

Respectfully submitted,

*s/Stephen C. Moss*
STEPHEN C. MOSS
Assistant Federal Public Defender
Walnut Street, Suite 600
Kansas City, MO 64106
(816) 471-8282
steve_moss@fd.org

**CERTIFICATE OF SERVICE**

It is CERTIFIED the foregoing was electronically filed on this 12th day of February, 2024, and that all parties received a copy under the ECF system.

*s/Stephen C. Moss*
STEPHEN C. MOSS